IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **NTP MARBLE, INC. d/b/a** | : | **Bankruptcy No. 13-10087 (SR)** |
| **COLONIAL MARBLE & GRANITE** | : | |
| | : | Hearing Date: March 13, 2013 |
| **Debtor.** | : | Hearing Time: 1:30 p.m. |
| | : | Hearing Place: Courtroom 4 |
| | : | |

**MOTION OF ANASTASIOS PAPADOPOULOS FOR AN ORDER DISMISSING
THE DEBTOR'S BANKRUPTCY CASE PURSUANT TO 11 U.S.C. § 1112 OR, IN THE
ALTERNATIVE, FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE
PURSUANT TO 11 U.S.C. § 1104 AND FOR RELATED RELIEF**

Anastasios Papadopoulos a/k/a Tasos Papadopoulos ("Movant" or "Tasos")[1], by and

through his undersigned counsel, Obermayer Rebmann Maxwell & Hippel LLP, hereby moves

the Court for an Order dismissing the bankruptcy case of NTP Marble, Inc., d/b/a Colonial

Marble & Granite (the "Debtor" or "NTP"), or, alternatively, directing the immediate

appointment of a Chapter 11 Trustee for the Debtor's estate in order to ensure that the Debtor has

competent management in the above-captioned bankruptcy case (the "Motion").  In support

thereof, and as grounds for the relief requested in the Motion, Tasos alleges as follows:

I.    **INTRODUCTION**

1.      Tasos asserts that dismissal of the Debtor's bankruptcy case is appropriate in this

case which, as set forth in greater detail below, amounts to nothing more than a litigation gambit

by the Debtor to frustrate and delay resolution of a two-party dispute between Tasos, on one

hand, and the Debtor and its principals, on the other, that has already been fully-adjudicated by

the Court of Common Pleas of  Philadelphia County ("State Court").  The Debtor lost a hotly-

---

[1] Because Tasos Papadopoulos is unrelated to but shares the same surname as Nikolaos "Nikos" and Athanasios
"Tom" Papadopoulos, who are both principals of the Debtor, first names will be used to avoid confusion in
identifying the parties.

contested trial before the Honorable Albert John Snite, Jr., which resulted in a jury verdict in favor of Tasos and against the Debtor and its principals in the amount of $4,166,667.[2]  The Debtor filed its bankruptcy petition on the very day the stay of execution on the judgment expired.  Despite the mismanagement of its principals, the Debtor remains a fundamentally-sound business.  As will be discussed in greater detail below, on information and belief, other than Tasos' judgment, the Debtor generally pays its debts as they become due, faced no overwhelming pressure from its other creditors, has manageable levels of secured debt, has no priority debt and has modest levels of current general unsecured debt obligations. The Debtors' bankruptcy filing was prompted solely by the imminent execution on Tasos' judgment and represents an impermissible litigation tactic to frustrate and delay enforcement thereof.

2.      Although the Debtor has listed Tasos' judgment claim as "disputed" in its List of Creditors Holding 20 Largest Unsecured Claims and in Schedule F (Creditors Holding Unsecured Nonpriority Claims), the Debtor is precluded by the Rooker-Feldman doctrine and precepts of *res judicata* from challenging in the Bankruptcy Court the validity of the state-law judgment.[3]

3.      For the reasons set forth in greater detail below, the Debtor's bankruptcy case should be dismissed pursuant to 11 U.S.C. § 1112 or a Chapter 11 trustee put in place pursuant to 11 U.S.C. § 1104 to replace the Debtor's current management and board of directors.

---

[2] This Court should take judicial notice of the Court of Common Pleas rulings and opinions in the underlying state court cases between Tasos and the Debtor.  Parks v. Twp. of Portage, 2010 U.S. App. LEXIS 13196, *2 (3d Cir. 2010) (citing McTernan v. City of York, 577 F.3d 521, 526 (3d Cir. 2009) ("explaining that the 'court may take judicial notice of a prior judicial opinion'") and Lumen Constr., Inc. v. Brant Constr. Co., 780 F.2d 691, 697 (7th Cir. 1985) ("'[T]he official record of the parallel state case is a proper object for judicial notice.'").
[3] *See* Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 283, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005) (explaining that "federal courts of first instance" lack jurisdiction to "review and reverse unfavorable state-court judgments" (citing Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S. Ct. 149, 68 L. Ed. 362 (1923); D.C. Court of Appeals v. Feldman, 460 U.S. 462, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983)).

## II.    JURISDICTION AND VENUE

4.    On January 4, 2013 (the "Petition Date"), the very day the stay of execution on

the judgment expired, the Debtor filed a voluntary petition for relief under Chapter 11 of the

United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code").

5.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(a) and

1334.  The statutory predicates for the relief requested herein are Sections 105, 1104 and 1112 of

the Bankruptcy Code and Rules 1017, 2002, 2007.1 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Local Rules for the United States Bankruptcy Court for

the Eastern District of Pennsylvania ("L.B.R.") 1017-2, 5070-1(f) and 9014-3.

6.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

7.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and/or 1409.

## III.    FACTUAL BACKGROUND

### A.    The Formation and Ownership Structure of NTP.

8.    Tasos is one of the founders and co-incorporators of NTP and has a lifetime of

expertise in the retail marble and granite industry. In 1989, Tasos started, owned and operated a

marble and granite retail store in Camden, New Jersey, followed by one in West Chester,

Pennsylvania, before returning to his native homeland of Greece. In 2005, Tasos returned from

Greece with the idea of creating a new marble and granite business in the United States. To this

end, he met with a number of potential investors and partners. The prospective business

arrangement was always the same: equal partnership and ownership, with capital to be provided

by the investor/partners while Tasos would contribute his expertise and business plan to start and

operate the enterprise. While searching for potential investor/partners, Tasos scouted for ideal

warehouse and showroom locations to start the business, selecting the eventual site of the Debtor

at Henderson and Church Roads in King of Prussia, Pennsylvania. In November 2005, with

much of the groundwork for a successful business already completed, Tasos decided to partner

with Athanasios "Tom" Papadopoulos ("Tom"), who pledged to provide a $1 million capital

investment for the business as well as access to an existing telemarketing call center.

9.      NTP was incorporated by Tasos and Tom through the filing of Articles of

Incorporation dated December 15, 2005. The initial ownership allocation of NTP was on a 50/50

basis: one half to Tasos and the other half to be shared between Tom and his son Nikolaos

"Nikos" Papadopoulos ("Nikos"). However, after NTP's incorporation, Tom requested and

Tasos acceded to the inclusion of Angelo Bekas ("Angelo") in the ownership group. The

allocation of ownership in NTP was modified to be based on thirds rather than halves: one-third

for Tasos, one-third for Tom and Nikos, and one-third for Angelo. Unlike the other

investor/partners, Tasos' equity interest was based on his expertise and business plan in setting

up the operation. In addition to Tom's telemarketing operation, Tom and Angelo pledged a

combined capital investment of $600,000 in the form of cash and the proceeds of personal bank

loans.[4]

**B.      The Illegal Ouster of Tasos and the Falsification of NTP's Business Records.**

10.      Once Taso's business plan was implemented, with NTP becoming operational and

the foundation for further success having been laid, Tasos was unceremoniously ousted from the

business by the other investor/partners. Tasos had long been pressing his partners for an official

meeting to discuss the shortfall in their investment obligations to the company, questionable

withdrawals from the business and the unilateral decision by Tom to give an employee a 200%

raise. In June 2007, Tasos was abruptly informed that he was out of the company. The locks to

the building were then changed and a closed-circuit security system was installed to shut him out

---

[4] The capital actually invested into NTP by Tom and Angelo fell far short of this pledge.

of the building and he was denied access to his personal copies of the company's business records.

11.     The remaining principals of NTP then destroyed, altered and/or fabricated company documents, including minutes of meetings and IRS tax filings, in a scheme to reduce the amount of or even eliminate all reference of Tasos' ownership interests in NTP.

12.     As it turned out, Tasos' business plan proved to be highly effective as NTP quickly grew and became the dominant marble and granite retailer in the Philadelphia region. Defying the effects of the Great Recession, sales grew exponentially from $1.5 million in 2007 to $27.7 million in sales and a gross profit of $12 million in 2011, the last year for which sales figures were presented.

### C.    The State Court Litigation, the Judgment in Favor of Tasos and the Resulting Bankruptcy Filing by NTP.

13.     In February 2010, Tasos commenced a civil action in the Court of Common Pleas of Philadelphia County (February Term. 2010. No. 02105) ("State Court") against NTP, Nikos, Tom and Angelo ("Defendants") seeking damages for breach of contract resulting from the ouster of Tasos from the ownership of NTP ("State Court Litigation").

14.     Following the close of pleadings, discovery and pre-trial motions, the trial of the State Court Litigation was held, where it was established, among other things, that:

(a)     The individual Defendants and related insiders personally and improperly withdrew and diverted approximately $4.4 million of profits from NTP;[5]

(b)     NTP failed to maintain accurate and reliable accounting records and procedures;[6]

---

[5] At the trial of the State Court Litigation, Sasha Afanassiev, CPA, one of Tasos' expert witnesses, provided uncontroverted testimony that NTP made payments, exclusive of payroll, to insiders in the following aggregate amounts: more than $460,000 to Nikos; $500,000 to Tom; more than $970,000 to Pamela Papadopulous, Tom's estranged wife; $518,000 to Angelo; and more than $1,900,000 to Antenna Star, a company wholly owned by Tom.
[6] At trial it was established that NTP's accounting procedures were irregular and inconsistent. Examples of NTP's accounting irregularities include the following without limitation. The alleged $300,000 of initial contribution for capital stock by Nikos consisted of two $150,000 deposits from Antenna Star and were posted as loans from

(c)    Cash receivables were routinely given directly to Nikos or Tom with no corresponding book accounting entries;

(d)    The Defendants falsely claimed that less than 1% of NTP's business was in cash while former employees testified that approximately 25% of sales were in cash;

(e)    Amounts spent for advertising, raw goods and payroll far exceeded industry norms;[7] and

(f)    Defendants fabricated and altered NTP's corporate documents in an effort to divest Tasos' ownership interests which were belied by true and correct documents previously submitted to PNC Bank in connection with loan applications for the capitalization of the business.

15.    At the conclusion of the trial, the jury, on or about May 11, 2012, returned a verdict in favor of Tasos and against the Defendants, jointly and severally, in the amount of $4,166,677 ("Verdict"). In doing so, the jury found the fair value of NTP to be $12.5 million and awarded Tasos damages in the amount of one-third of the value of the company. A true and correct copy of the Verdict Form is made a part hereof and is attached hereto as Exhibit "A".

16.    The Defendants filed a Motion for Post-Trial Relief and a Motion to Reduce the Amount of Security for a Stay Pending Appeal (collectively, "Defendants' Post-Trial Motions"). Tasos opposed Defendants' Post-Trial Motions. Rather than even attempting to obtain a supersedeas bond to properly effect a stay of the enforcement of the judgment pending appeal pursuant to Pa. R.A.P. 1731(a)[8], the Defendants' Post-Trial Motions requested a reduction of the amount of a bond.  Pennsylvania law simply does not permit the evasion of requirements for a

---

shareholders and not for issuance and capitalization of stock. The alleged $125,000 initial contribution from Angelo could not be confirmed as the accounting records of NTP did not indicate deposits from Angelo in 2006. Further, Antenna Star engaged in structured transactions where advances were repeatedly booked and then immediately withdrawn.

[7] The Defendants' expert report conceded that NTP's annual payroll of $4.5 million was more than 25% higher than it should be. The Debtor's cost of goods sold in 2011 exceeded 36% of gross sales, while the ceiling for the industry is 25% and the Debtor's own business model indicated that it should be 12%.

[8] Pa. R.A.P. 1731(a) permits a judgment-defendant to stay execution of a judgment during an appeal "upon filing with the clerk of the lower court of appropriate security in the amount of 120% of the amount found due by the lower court and remaining unpaid." Thus, the amount of the supersedeas bond would be $5 million.

supersedeas bond sought by the Defendants.  Not surprisingly, on or about December 3, 2012, the State Court denied Defendants' Post-Trial Motions.

17.    Following the denial of the Defendants' Post-Trial Motions, judgment in the amount of $4,166,677 was entered on the Verdict on or about December 6, 2012 ("Judgment").

18.    The Defendants responded to the entry of the Judgment by filing an Emergency Petition for a Stay of Execution Proceedings on December 7, 2012 ("Defendants' Stay Motion"), which was temporarily resolved by an agreement among the parties to stay execution of the Judgment through January 4, 2013.

19.    On January 3, 2013, the Defendants filed a notice of appeal of the Judgment to the Superior Court of Pennsylvania, doing so, however, without attempting to obtain a supersedeas bond, which is the procedure required under Pa.R.A.P. 1731(a) to effect a stay of the enforcement of the Judgment pending appeal.

**D.      The Filing of Bankruptcy to Thwart Enforcement of the Judgment.**

20.    Unwilling to obtain a supersedeas bond to effect a stay of the Judgment pending appeal and with the agreement among the parties to stay execution of the Judgment expiring on January 4, 2013, the Defendants filed a petition for NTP that same day, commencing the instant chapter 11 bankruptcy case. The filing of the petition was done solely as a litigation tactic to invoke the automatic stay protections of 11 U.S.C. § 362, and not for any legitimate reorganization purpose. The Defendants' counsel in the State Court Litigation admitted as much in an email dated December 11, 2012. A true and correct copy of the December 11 email from Gavin Lentz is made a part hereof and is attached hereto as Exhibit "B". In a coordinated attempt

to frustrate enforcement of the Judgment, Tom, Nikos and Angelo filed petitions on January 16,

2013, commencing separate individual Chapter 11 cases before this Court.[9]

21.    Despite the malfeasance and rampant mismanagement of the Debtor by Nikos,

Tom and Angelo, however, NTP remains a profitable and solvent entity, due in large part to the

solid business foundation established by Tasos. This assertion is buttressed by the Schedules and

Statements recently filed by the Debtor which reveal that the Debtor has increased sales revenue

from 2011 to 2012,[10] enjoys low levels of secured debt, no priority debt and, other than the

Judgment, manageable amounts of general unsecured debt. On information and belief, all or a

substantial portion of the Debtor's trade debt is current and was being paid within generally-

accepted terms.

22.    Tasos intends to issue discovery requests to the Debtor to demonstrate that the

bankruptcy filing was precipitated solely as a litigation tactic to stave off the enforcement of the

Judgment and not by any need to reorganize its business operations and will be filing a Motion to

Shorten Discovery Compliance ("Motion to Shorten Discovery Compliance") to coordinate

discovery responses with this Motion.

## IV.    REQUESTED RELIEF

### A.    The Debtor's Bankruptcy Case Should be Dismissed Pursuant to 11 U.S.C. § 1112.

23.    Section 1112(b) of the Bankruptcy Code, which was redrafted by Congress as part

of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8,

119 Stat. 23 (2005) ("BAPCPA"), provides in pertinent part:

---

[9] The individual bankruptcy cases are proceeding under the following case numbers: Tom (13-10408); Nikos (13-10407); and Angelo (13-10406).
[10] According to the Debtor's Statement of Financial Affairs, sales revenue increased from $27,730,660.00 in 2011 to $30,032,277.07 in 2012, an increase of 8.2%.

> [O]n request of a party in interest, and after notice and a hearing,
> absent unusual circumstances specifically identified by the court
> that establishes that the requested conversion or dismissal is not in
> the best interests of creditors and the estate, the court **shall** convert
> a case under this chapter to a case under chapter 7 or dismiss a case
> under this chapter, whichever is in the best interests of creditors
> and the estate if the movant establishes cause.

11 U.S.C. § 1112(b)(1) (emphasis added).

24.     Section § 1112(b)(4) lists sixteen (16), non-exclusive examples of "cause",[11] and

courts should "consider other factors as they arise."  See In re Brown, 951 F.2d 564, 572 (3d Cir.

1991) citing S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), *reprinted in* 1978 U.S.C.C.A.N.

5787, 5903; H.R.Rep. No, 595, 95th Cong., 1st Sess. 406 (1977); In re Gateway Access

Solutions, Inc., 374 B.R. 556, 561 (Bankr. M.D.Pa. 2007) (the § 1112(b)(4) list is non exclusive

and should be viewed as illustrative as opposed to exhaustive).

25.     A lack of good faith supports the dismissal of a bankruptcy case as it is well

established in this jurisdiction that:

> in addition to granting relief for one of the reasons enumerated in
> Bankruptcy Code Section 1112(b), the Court may dismiss a
> Chapter 11 case for lack of good faith.  Although no provision of
> the Code expressly authorizes dismissal of a case on this ground,
> even in the absence of express statutory authorization, the
> requirement of good faith has been held to be an implicit condition
> to the filing and maintenance of a bankruptcy case for over a
> century.

Philadelphia Rittenhouse Developer, L.P., 201 Bankr. LEXIS 1930, May 25, 2011, *24-25

(Bankr.E.D.Pa. 2010) (citing 7 Collier on Bankruptcy ¶ 1112.07 (Alan N. Resnick & Henry J.

---

[11] The non-exclusive list of examples of "cause" enumerated in 11 U.S.C. § 1112(b)(4) includes a substantial or continuing loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; gross mismanagement of the estate; failure to maintain appropriate insurance; unauthorized use of cash collateral; failure to comply with an order of the court; failure to satisfy any filing of reporting requirements; failure to attend the meeting of creditors; failure to provide information or attend meetings requested by the United States Trustee; failure to pay post-petition taxes; failure to file a disclosure statement or to timely confirm a plan; failure to pay quarterly fees; revocation of a confirmation order; material default in a confirmed plan; termination of a confirmed plan upon occurrence of a specified condition; and failure to pay a post-petition domestic support obligation.

Sommer 16th ed.)); <u>see also</u> <u>In re SGL Carbon Corporation</u>, 200 F.3d 154, 160 (3d Cir. 1999) (holding that a Chapter 11 case is subject to dismissal for cause if not filed in good faith.).

26.     In fact, a debtor's bad faith filing of a petition for reorganization is sufficient "cause" for immediate dismissal thereunder. <u>See</u> <u>In re PPI Enters. (U.S.), Inc.</u>, 324 F. 3d 197, 210 (3d Cir. 2003) ("[u]nder § 1112(b), bankruptcy courts may dismiss Chapter 11 filings for "cause" if a petition is filed in "bad faith."); <u>SGL Carbon</u>, 200 F.3d at 160 ("Chapter 11 bankruptcy petitions are subject to dismissal under . . . § 1112(b) unless filed in good faith."). "Several courts have held that the filing of a bankruptcy petition as a litigation tactic, or to resolve what is essentially a two-party dispute, is an indication of a bad faith filing." <u>In re Business Information Co., Inc.</u>, 81 B.R. 382, 385 (Bankr.W.D.Pa. 1988). The Third Circuit has determined that when the movant proves that the debtor's bankruptcy filing is an abuse of the bankruptcy process and was, thus, filed in "bad faith", the court does not need to examine the second part of the test and determine whether dismissal or conversion is in the best interest of the creditors. <u>SGL Carbon</u>, 200 F. 3d at 159 fn. 8. Thus, a debtor's bad faith filing of a petition of reorganization alone is sufficient "cause" for immediate dismissal thereunder.

27.     Generally, the facts surrounding good faith will be determined by circumstantial evidence because it is unlikely that a debtor will acknowledge its own bad faith. <u>Rittenhouse</u>, 201 Bankr. LEXIS 1930, at *28.

28.     This Court has cited the following list of factors to facilitate the necessary evaluation of good faith in the bankruptcy context:

(1)     the debtor has few or no unsecured creditors;

(2)     there has been a previous bankruptcy petition by the debtor or a related entity;

(3)     the prepetition conduct of the debtor has been improper;

(4)     the petition effectively allows the debtor to evade court orders;

(5)     there are few debts to non-moving creditors;

(6)     the petition was filed on the eve of foreclosure;

(7)     the foreclosed property is the sole or major asset of the debtor;

(8)     the debtor has no ongoing business or employees;

(9)     there is no possibility of reorganization;

(10)    the debtor's income is not sufficient to operate;

(11)    there was no pressure from non-moving creditors;

(12)    the reorganization essentially involves the resolution of a two-party dispute;

(13)    a corporate debtor was formed and received title to its major assets immediately before the petition; and

(14)    the debtor filed solely to create the automatic stay.

Id. (citing In re SB Properties, Inc., 185 B.R. 198, 205 (E.D.Pa. 1995)).

29.     After compiling this list, the Court in SB Properties cautioned that:

Courts should guard against any impulse to overemphasize any one factor, to engage in mere "indicia-counting," or to "force particular facts into previously identified patterns .". . . [T]he totality of factors must be viewed, that no one factor can ever be deemed dispositive, and that any conceivable list of factors cannot be exhaustive.

SB Properties, 185 B.R. at 205 n. 5 (quoting Carolin Corp. v. Miller, 886 F.2d 693, 701 (4th Cir. 1993)).

30.     Once bad faith is alleged, the debtor bears the burden of proving good faith.  In re DCNC North Carolina I, LLC, Goose Marsh LLC, 407 B.R. 651, 661 (Bankr. E.D. Pa. 2009) (citing In re PPI Enters. (U.S.), Inc., 324 F.3d 197, 211 (3d Cir. 2003)).

31.     That this case is in its early stages is no impediment to its immediate dismissal

under 11 U.S.C. § 1112(b).  "A Chapter 11 case may be dismissed at any time.  Creditors need

not wait until a debtor proposes a plan or until the debtor's exclusive right to file a plan has

expired . . .  The very purpose of § 1112(b) is to cut short this plan and confirmation process

where it is pointless."  Matter of Woodbrook Assoc's, 19 F.3d 312, 317 (7th Cir. 1994),

rehearing denied (1994)(citations omitted).

(i)      <b>The NTP bankruptcy petition was filed in subjective bad faith.</b>

32.     Here, it is patently clear that the Debtor's petition was filed as a maneuver to

delay enforcement of the Judgment in the State Court Litigation and to circumvent the

requirements of obtaining a supersedeas bond to effect a stay pending appeal. The Third Circuit

has held that where a Chapter 11 petition is filed merely to obtain tactical litigation advantages,

"such filing is not within the legitimate scope of the bankruptcy laws, and courts have typically

dismissed Chapter 11 petitions under these circumstances as well." SGL Carbon, 200 F.3d at

165; see also Furness v. Lilienfiled, 35 B.R. 1006, 1013 (D. Md. 1983)("The bankruptcy

provisions are intended to benefit those in genuine financial distress. They are not intended to be

used as a mechanism to orchestrate pending litigation."). The timing of the Chapter 11 filing is

especially indicative of bad faith.  In re Century City, 8 B.R. 25 (Bankr. D.N.J. 1980). See also

Southern Land Titile Cortporation v. Mitchell, 375 F.2d 874 (5th. Cir. 1967) (attempt to use the

proceedings as a means to simply gain time viewed as demonstrative of a lack of faith). The

timing of the filing of the Debtor's petition, on the very day that the parties' agreement to stay

enforcement of the Judgment was set to expire, illuminates the true and sole motivation of the

Debtor. "As a general rule where. . . timing of a Chapter 11 petition is such that there can be no

doubt that the primary, if not sole purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith." SGL Carbon, 200 F.3d at 165.

33.     A compelling number of the circumstantial factors identified in SB Properties are directly implicated by the Debtor's filing of the petition as a litigation tactic. The petition effectively allows the Debtor to evade court orders (Factor 14); the petition was filed on the eve of foreclosure or, in this instance, the day the agreement to stay execution expired (Factor 6); the reorganization essentially involves the resolution of a two-party dispute (Factor 12); and the debtor filed to create the automatic stay (after failing in the State Court Litigation to obtain a supersedeas bond and after the agreed stay of execution expired) (Factor 14).

34.     In addition to the SB Property factors that directly relate to the Debtor's filing of the petition as a litigation tactic, there are additional extant circumstantial factors that reveal the Debtor's bad faith filing. First, other than Tasos' Judgment, there are comparatively few debts to unsecured creditors (Factor 1) and there are few debts to non-moving creditors (Factor 5). Based on Debtor's Schedule F (Creditors Holding Unsecured Nonpriority Claims), excluding Tasos' Judgment, the Debtor has less than $4 million in unsecured debt, of which more than half is owed to the Debtor's two major stone suppliers.[12] On information and belief, the Debtor is generally paying its obligations as they become due and within acceptable terms. Further, as the petition was filed solely to thwart the efforts of Tasos to execute upon his Judgment, there is no indication of any pressure from non-moving creditors (Factor 11). Tellingly, the monthly operating report filed by the Debtor on February 21, 2013 shows net ordinary income after expenses of $283,652, hardly indicative of a company struggling to survive.

---

[12] Debtor's Schedule F lists MS International, Inc. with a claim of $1,825,161.73 and La Pointe Marmi with a claim of $442,780.00.

35.    Tasos' Judgment is by far the single largest claim against the Debtor and represents more than 50% of the Debtor's unsecured debt.  "Where, as here, the indebtness which does lie at the root of the filing is so vastly in excess of any other debt, the Court believes it appropriate to place greater weight on the amount of the debt than the number of holders." Rittenhouse, 201 Bankr. LEXIS 1930, at *44.

36.    The pre-petition conduct of the Debtor in making insider transfers of $4.4 million, failing to maintain appropriate protocols for cash receivables, failing to maintain reliable accounting procedures, fabricating and falsifying company documents, spending amounts on advertising, raw goods and payroll that were excessive and disproportionate to industry norms, all of which were established during the State Court Litigation, supports the dismissal of the bankruptcy case (Factor 3).

37.    Additionally, the Debtor's post-petition conduct warrants the dismissal of this case. In response to item 3(c) of the Statement of Financial Affairs (Payments within 1 year to Insiders), the Debtor lists insider payments of $64,000.00 having been made to Pamela Papadopoulous ("Pam"), the ex-wife of Tom. In an attachment to SOFA 3(c), the Debtor states that a list of one-year insider payments to Angelo, Tom, Nikos and Pam would be provided by February 6, 2013. To date, no supplement to SOFA 3(c) has been filed by the Debtor. Given the concerns about insider transfers raised in the State Court Litigation as well directly to Debtor's counsel, it is implausible that the failure to file the supplement to SOFA 3(c) was the result of inadvertence.

38.    Finally, the Debtor recently filed on February 19, 2013, a Notice of Intent to Compensate Officers and Insiders Pursuant to L.B.R. 4002-1 ("Notice of Intent") that reflects the extraordinarily-high levels of compensation proposed to be paid to the insiders of the Debtor

during the bankruptcy case. The Debtor intends to pay Nikos, Tom and Angelo annual compensation of $208,000 each during the bankruptcy case and reveals that as of the 90th day prior the petition date, Nikos, Tom and Angelo were each receiving annual compensation of $390,000, excluding other fringe benefits such as luxury automobiles. These generous compensation packages belie the Debtor's claims of economic struggle made during the State Court Litigation.

39.     Accordingly, most of the circumstantial factors articulated in <u>SB Properties</u> are implicated here and it is beyond cavil that the Debtor's petition was filed in bad faith.

### (ii)     The Debtor's bankruptcy case is objectively futile.

40.     Tasos asserts that a finding of bad faith filing alone is sufficient to warrant a dismissal of the Debtor's bankruptcy case under 11 U.S.C. § 1112(b). <u>See</u> <u>In re Phoenix Piccadilly</u>, 849 F.2d 1393, 1395 (11th Cir. 1988)(bad faith dismissal warranted when either futility of any possible reorganization <u>or</u> bad faith present) and <u>In re Clinton Centrifuge, Inc.</u>, 72 B.R. 900, 905 (Bankr. E.D. Pa. 1987)("in evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended."). However, some courts in this district have held that dismissal under 11 U.S.C. § 1112(b) is warranted when subjective bad faith is coupled with the additional finding of "objective futility" that the debtor has no realistic chance of reorganization. <u>Rittenhouse</u>, 201 Bankr. LEXIS 1930, at *26-27.

41.     It is patently clear that the Debtor will be unable confirm a plan over the objection of Tasos as the Debtor will be unable to satisfy the requirements of 11 U.S.C. § 1129(a)(10).  For the Debtor to obtain confirmation of a plan through a cramdown, at least one impaired class of class of claims would have to vote to accept the plan. Pursuant to 11 U.S.C. § 1126(c),

acceptance by a class occurs when at holders of at least two thirds in amount and one half in

number vote in favor of the plan. Here, Tasos holds an unsecured judgment claim in the amount

of $4,166,667. This is by far the largest unsecured claim against the Debtor and represents more

than one-half of the amount of all unsecured claims. Thus, Tasos controls the class of general

unsecured creditors and a cramdown plan cannot be confirmed over Tasos' objection. Further,

the Debtors are prohibited from classifying some unsecured creditors separately to create an

accepting, impaired class of creditors. In re Swedeland, Dev. Group, Inc., 16 F.3d 552, 568 (3d

Cir. 1994)(discussing the limitations on debtor's ability to classify claims to create a accepting

class).

42.     In a seeming attempt to cover all of its bases, the Debtor schedules Tasos'

Judgment in Schedule F (Creditors Holding Unsecured Nonpriority Claims) as contingent,

unliquidated and disputed in the amount of $4,200,000.00, but identifies Tasos in Statement of

Financial Affairs Number 21 (Current Partners, Officers, Directors and Shareholders) as holding

a "disputed and alleged 33%" percentage of stock ownership while simultaneously listing Nikos

and Angelo with 75% and 25% stock ownership interests in the Debtor respectively.

43.     On or about February 1, 2013, the Debtor filed a Summons and Complaint (Adv.

No. 13-00050) against Tasos seeking to subordinate the Judgment pursuant to 11 U.S.C. § 510 to

the claims of unsecured creditors and to recharacterize the nature of the claim from a general

unsecured debt to a holder of an interest in equity ("Adversary").

44.     Tasos disputes that adequate gounds exist for the subordination of his Judgment

claim. Nevertheless, assuming *arguendo* for purposes of this Motion only that the Adversary

succeeds in subordinating the Judgment to the claims of unsecured creditors, the Debtor still

cannot obtain the confirmation of a plan over the objection of Tasos without paying the full value

of the Judgment.

45.     Subordination under 11 U.S.C. § 510 would serve only to place Tasos' Judgment

behind general unsecured claims in order of priority for distribution and would not place Tasos

on par with Nikos and Angelo, the Debtor's stated equity shareholders.

46.     The Debtor is solvent and a plan cannot be confirmed unless Tasos' Judgment is

paid in full. The jury in the State Court Litigation determined the value of the Debtor to be $12.5

million. As will be discussed in greater detail below, the Debtor is precluded by the Rooker-

Feldman doctrine and precepts of *res judicata* from challenging the validity of this state-law

adjudication of the Debtor's valuation. The Debtor lists secured debts of $405,921.07 in

Schedule D (Creditors Holding Secured Claims); no unsecured priority claims in Schedule E

(Unsecured Priority Claims); and general unsecured claims of $8,129.654.20 in Schedule F

(Unsecured Nonpriority Claims). Accordingly, the value of the Debtor excees its liabilities by $4

million.

47.     Further, any proposed plan where Tom, Nikos or Angelo retain any equity

interests in the Debtor would violate the Absolute Priority Rule and would not be confirmable

over the objection of Tasos unless the Judgment is paid in full.  Under the Absolute Priority

Rule, a Chapter 11 plan cannot be confirmed through cramdown over the objections of an unpaid

senior class of creditors if a junior class will receive any property or retain equity interests. 11

U.S.C. § 1129(b)(2)(B)(ii).

48.     Against this backdrop, any potential plan of the Debtor is objectively futile over

the opposition of Tasos, and argument by the Debtor to the contrary should be unavailing.

"Courts usually require the debtor do more than manifest unsubstantiated hopes for a successful

reorganization." 865 Centennial Avenue Associates Limited Partnership, 200 B.R. 800, 810

(Bankr. D.N.J. 1996) (citing In re Canal Place Ltd. P'ship, 921 F.2d 569, 577 (5th Cir. 1991).

49.    Here, the Debtor is incapable of confirming a plan over the objection of Tasos and

the bankruptcy case should be dismissed at this juncture as being filed in bad faith.

**B.    The Bankruptcy Court is required to Extend Full Faith and Credit to the State Court Rulings and Judgment.**

50.    Any attempt by the Debtor to assert a value of the Debtor's business other than the

$12.5 million determined by the jury in the State Court Litigation is prohibited by the Rooker-

Feldman doctrine. The Rooker-Feldman doctrine "prevents 'inferior' federal courts from sitting as

appellate courts for state court judgments." In re Knapper, 407 F.3d 573, 580 (3d Cir. 2005). A

claim is barred from federal adjudication according to the Rooker-Feldman doctrine if (i) "the

federal claim was actually litigated in state court prior to the filing of the federal action" or (ii) "if

the federal claim is inextricably intertwined with the state adjudication." Desi's Pizza Inc. v. City of

Wilkes Barre, 321 F.3d 411, 419 (3d Cir. 2003). A federal claim is "inextricably intertwined" with

an issue adjudicated by a state court when "(1) the federal court must determine that the state court

judgment was erroneously entered in order to grant the requested relief, or (2) the federal court must

take an action that would negate the state court's judgment." Knapper, 407 F.3d at 581. According

to the Supreme Court, the Rooker-Feldman doctrine is confined to "cases brought by state-court

losers complaining of injuries caused by state-court judgments rendered before the district court

proceedings commenced and inviting district court review and rejection of those judgments."

Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 284 (2005). Here, the

determination of the value of NTP was a critical issue in the State Court Litigation and integral to

the Judgment.

51.     In addition to the prohibitions of the Rooker-Feldman doctrine, the Debtor is collaterally estopped from challenging the jury's determination of the value of the Debtor's business.

52.     Collateral estoppel principals apply in bankruptcy proceedings. Grogan v. Garner, 498 U.S. 297, 284 n.11 (1991); Brown, 951 F.2d at 571. This Court is bound to give full faith and credit to the rulings and orders in the State Court Litigation. Allen v. McCurry, 449 U.S. 90, 96 (1980); see also Cahn v. U.S., 269 F.Supp. 2d 537 (D.N.J. 3002)(holding that the re-litigation of issues determined in the state court is barred by the application of collateral estoppel and *res judicata*). The Third Circuit has specifically noted that in bankruptcy proceedings that follow state court litigation, re-litigation of issues previously determined in the non-bankruptcy forum is prohibited, even where it affects a debtor's rights in "core" proceedings. Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1213 (3d Cir. 1991).

### C.    Alternatively, the Court Should Appoint a Chapter 11 Trustee or Examiner.

53.     In the event that this Court concludes that grounds to dismiss the Debtor's case are inadequate at this stage of the proceedings, then Tasos respectfully suggests that the appointment of a Chapter 11 trustee is appropriate and in the best interests of the creditors of the estate.

54.     Pursuant to 11 U.S.C. § 1104(a)(1), the Court "on request of a party in interest, shall order the appointment of a trustee for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management either before or after the commencement of the case." 11 U.S.C. § 1104(a)(1). Additionally, under 11 U.S.C. § 1104(a)(2), the Court must appoint a Chapter 11 trustee if the appointment is "in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2).

Bankruptcy courts have broad discretion to appoint a trustee, and may do so *sua sponte*. 2 L.

King, et al., <u>Collier on Bankruptcy</u>. ¶ 1104.02.

55.     In finding the appointment of a trustee appropriate, courts have relied upon such

factors as (i) the evenhandedness in dealings with insiders or affiliates; (ii) a failure to maintain

complete and accurate financial records; (iii) the trustworthiness of the debtor; (iv) the debtor's

past and present performance and prospects for successful rehabilitation; (v) the trust and

confidence, or lack thereof, of the Debtor's creditors and the business community in general; (vi)

the existence of inter-company financial transfers and potential conflicts of interest; (vii) self

dealing and the existence of preferential and/or fraudulent transfers; and (viii) the benefits of

such an appointment against the burdens and costs of such an appointment. <u>See</u> <u>In re U.S.</u>

<u>Communications of Westchester, Inc.</u>, 123 B.R. 491, 495-96 (Bankr. S.D.N.Y. 1991).

56.     The failure to maintain effective corporate management has been held to

constitute gross mismanagement.  <u>Gateway Access Solutions, Inc.</u>, 374 B.R. 556, 564 (Bankr.

M.D. Pa. 2007)(<u>citing</u> <u>In re Broad Creek Edgewater L.P.</u>, 371 B.R. 752 (Bankr. D.S.C. 2007); <u>In</u>

<u>re Incredible Auto Sales, LLC</u>,  2007 Bankr. LEXIS 1305 (Bankr. D. Mont. 2007)).  <u>In re the</u>

<u>McCorhill Publ'g, Inc.</u>, 73 B.R. 1013 (Bankr. S.D.N.Y. 1987)(appointment of a Chapter 11

trustee warranted where the debtor-in-possession failed to maintain complete and accurate

financial records, permitted financial transfers between the debtor and related non-debtor entities

operated by the debtor's prioncipals); <u>In re Colby Const. Corp.</u>, 51 B.R. 113 (Bankr. S.D.N.Y.

1985)(appointment of a trustee warranted where the debtor-in-possession converted corporate

assets and made undocumented loans to management, debtor's books and records were in

disarray).

57.    The Debtor's books and records are in disarray. During the State Court Litigation, Tasos sustained his allegations of fraudulent accounting through the expert testimony of CPA Sasha Afanassiev, including the improper diversion of cash receipts. The Defendants responded by calling a forensic accountant and CPA but then instructed him to neither review the books nor to offer any substantive rebuttal. Further, in a scheme to reduce the amount of or even eliminate all reference of Tasos' ownership interests in NTP, the principals of NTP destroyed, altered and/or fabricated company documents, including minutes of meetings and IRS tax filings.

58.    The Debtor's principals have engaged in self dealing. It was established during the State Court Litigation that Tom, Angelo and Nikos and other insiders withdrew $4.4 million of the Debtor's corporate profits.

59.     In addition to the above, Tom, Angelo and Nikos have mismanaged the business affairs of the Debtor. It was established during the State Court Litigation that the Debtor's expenditures for advertising, raw materials and advertising were abnormally high. The Debtor's cost of goods sold in 2011 exceeded 36% of gross sales, while the ceiling for the industry is 25% and the Debtor's own business model indicated that it should be 12%. During trial, Angelo admitted that NTP was spending almost double what it should have for advertising and the Defendants' own expert James Haefele admitted that NTP's advertising expenses were unusually high for the industry as was its payroll of $4.5 million and its material costs,

60.    Accordingly, due to the mismanagement of the business affairs of the Debtor by its current principals and management; the failure to maintain proper procedures for the handling and documentation of cash receipts; the excessive expenditures for payroll, advertising and raw materials; and the pre-petition transfers to the Debtor's insiders, among other things, grounds exist for the appointment of a Chapter 11 trustee pursuant to 11 U.S.C.S. § 1104(a)(1).

WHEREFORE, for the aforementioned averments and authority Anastasios

Papadopoulos respectfully requests the dismissal of the Debtor's bankruptcy case or,

alternatively, for the appointment of a Chapter 11 trustee and for such other and further relief as

is just and equitable

Respectfully submitted,

Dated: February 21, 2013        By: */s/ Edmond M. George*
Edmond M. George, Esquire
D. Alexander Barnes, Esquire
Michael D. Vagnoni, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Blvd.
Philadelphia, PA 19103-1895
215-665-3014 – Telephone
215-665-3165 – Facsimile

*Counsel to Anastasios Papadopoulos*